```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                :
CARING HABITS, INC.,                                            :
                                                                :
                       Plaintiff and Counterclaim               :   11-cv-5768 (NSR) (LMS)
                       Defendant,                               :   OPINION & ORDER
       -against-                                                :
                                                                :
FUND FOR THE PUBLIC INTEREST, INC. and                          :
MASSACHUSETTS PUBLIC INTEREST                                   :
RESEARCH GROUP, INC.,                                           :
                                                                :
                       Defendants and Counterclaim              :
                       Plaintiffs.                              :
--------------------------------------------------------------- X
```

NELSON S. ROMÁN, United States District Judge

Defendants Fund for the Public Interest, Inc. ("FFPI") and Massachusetts Public Interest Research Group, Inc. ("MPIRG" and, together with FFPI, the "Funds") move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on all claims brought by Plaintiff Caring Habits, Inc. ("CHI"). CHI cross-moves for summary judgment on all of its claims and on the Funds' counterclaim. For the reasons described below, the Funds' motion for summary judgment is GRANTED, and CHI's cross-motion for summary judgment is GRANTED in part and DENIED in part.

## BACKGROUND

The instant dispute arises from the Funds' early termination of a contractual provision designating CHI as the Funds' exclusive agent for the processing of recurring donations (the "Exclusive Agency"). The Funds are nonprofit organizations that support environmental, civic, and consumer-protection groups through public interest campaigns. (Defs.' Mem. Law Supp.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/13/2014

Mot. Summ. J. at 3, ECF No. 53 [hereinafter Defs.' Opening Br.].)  The Funds rely largely on donations from individuals, many of whom sign up to donate a fixed amount each month.  (*Id.* at 3.)  By contract dated October 5, 1996 (the "1996 Agreement"), FFPI retained CHI (then known as Clearing House Initiators, Inc.) to process FFPI's credit card and electronic-funds-transfer donations.  (Wesolowski Decl. ¶ 8-9, ECF No. 57; Wesolowski Decl. Ex. A, ECF No. 57-1 [hereinafter 1996 Agreement].)  The 1996 Agreement required CHI to "process and transmit" "debit orders evidenced by an electronic communication or depository transfer check . . . initiated by [FFPI]."  (1996 Agreement, *supra*, at preamble, ¶ 5.)  But it did not obligate FFPI to use CHI's services, nor did it designate CHI as the exclusive agent of FFPI for processing donations.  (Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶ 16, ECF No. 60.)

A significant processing error[1] in late 2005 led the parties to negotiate a supplemental contract, dated April 4, 2006 (the "2006 Agreement").  (*Id.* ¶¶ 19-20; Wesolowski Decl. ¶ 14.)  Pursuant to the 2006 Agreement, in exchange for CHI making the Funds whole for the donations lost as a result of the error, the Funds agreed to "designate CHI as their exclusive agent for processing of all recurring contributions ('Exclusive Agency')" for a period of five years and six months.  (*See* Wesolowski Decl. Ex. B ¶ 9, ECF No. 57-2 [hereinafter 2006 Agreement].)  The 2006 Agreement attached the 1996 Agreement as Exhibit B and contained an integration clause stating, "The sixteen (16) paragraphs of this Agreement, Exhibits A & B, and the Contract, as amended, contain the entire understanding of the parties."  (*Id.* ¶ 16.)

Paragraph 10 of the 2006 Agreement sets forth certain conditions of termination:

> The Exclusive Agency can be terminated if, after prior written notice by [the Funds], there is a repeated and marked deterioration in the level of service provided by CHI, including untimely reporting or recurring errors, which are the fault of CHI.  This shall not apply to single-instance

---

[1] The error was not CHI's fault.

>   service errors, such as that referred to in paragraphs 3-5 herein, which are not the fault of CHI. However, this shall apply in the case that CHI does not remedy such service errors.

(*Id.* ¶ 10.)  The 1996 Agreement contains its own termination clause: "These Conditions and Procedures and all services hereunder may be terminated by the Client or CHI at any time by giving the other party prior written notice, with adequate notice to complete the current month cycle, of its intent to terminate and giving the date of termination."  (1996 Agreement, *supra*, ¶ 11.)

From 2006 until August 2010, the Funds processed initial donations for new members internally, and used CHI to process all subsequent donations.  (Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶ 124.)  There is no evidence that the Funds used any agent other than CHI to process initial or subsequent donations during that period.  (*Id.* ¶ 125.)  However, the Funds terminated the Exclusive Agency in August 2010, under the following circumstances.

In July 2006, CHI committed a billing error affecting over 3,300 donors.  (*Id.* ¶¶ 44-46.)  In response, by letter dated August 2, 2006 (the "2006 Letter"), the Funds stated:

>   [T]he Fund considers this error to be of the type referred to in Paragraph 10 of the agreement.  If such errors continue in the future, the Fund reserves its right to consider ending the Exclusive Agency of our agreement with CHI.  We sincerely hope that no reprocessing errors occur in the future, but did want to make clear that any recurrence of this sort of error, which was clearly the fault of CHI, would not be considered part of an acceptable level of service.

(Wesolowski Decl. Ex. D, ECF No. 57-4.)

CHI committed numerous errors thereafter.  CHI overbilled donors, continued to charge donors after cancelation, failed to start billing new donors, and/or sent the Funds erroneous reports that omitted data, contained inaccurate data, contained formatting errors, or were otherwise erroneous on or around at least the following dates:  May 24, 2006, July 12, 2006, July 20, 2006, October 27, 2006, January 23, 2007, April 30, 2007, July 9, 2007, August 30, 2007,

3

September 3, 2007,[2] September 17, 2007, November 28, 2007, another unspecified date in November 2007, December 23, 2007, January 10, 2008, June 18, 2008, August 25, 2008, August 28, 2008, October 30, 2008, January 8, 2009, March 5, 2009, March 29, 2009, February 3, 2010, April 24, 2010, and May 24, 2010.[3]  (*See* Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶¶ 59-103.)

In August 2010, the Funds sent CHI an undated termination letter (the "2010 Letter") stating, in pertinent part, "the Fund is no longer required to honor the entire five and a half of years of [*sic*] exclusivity and will be terminating it early."  (Wesolowski Decl. ¶ 13, ECF No. 57; Wesolowski Decl. Ex. C, ECF No. 57-3.)  The letter also detailed a number of errors that had occurred from 2008 to 2010.  (Wesolowski Decl. Ex. C, ECF No. 57-3.)  CHI processed donations for the Funds until the end of August 2010.  (*See* Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶ 123.)

CHI's Amended Complaint asserts two counts.  Count I alleges that the Funds terminated the Exclusive Agency before the expiration of its term, without adequate basis for termination and without providing CHI proper notice.  (Am. Compl. ¶¶ 34-36, ECF No. 20.)  Count II alleges that by processing initial donations internally, instead of using CHI, the Funds violated the Exclusive Agency.  (*Id.* ¶¶ 37-43.)  The Funds' counterclaim alleges that CHI's errors harmed the Funds.  (Am. Answer & Countercl. 12-13, ECF No. 22.)  The Funds move for summary judgment on CHI's claims.  CHI cross-moves for summary judgment on its claims and the Funds' counterclaim.

---

[2] For the September 3, 2007 error, CHI disputes that it was at fault because an outside programmer, whom CHI hired, technically committed the error.  But CHI does not dispute that CHI hired the outside programmer.  And even if the Court were to disregard this error, it would not alter the overall conclusion, *infra*, that CHI committed "recurring errors."

[3] The Funds' submissions detail a large number of additional errors beyond those listed here.  (*See* Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶¶ 59-103.)  For some of those additional errors, CHI disputes that it was at fault by offering contrary evidence.  (*See id.*)  For others, however, the evidence provides no basis to apportion fault.  (*See id.*)  The Court has disregarded these additional errors for purposes of deciding the Funds' motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted).  In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249.  Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the records" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (stating that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation").

When both sides have moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *see, e.g.*, *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981).

## PRINCIPLES OF CONTRACT INTERPRETATION

"Under New York law, the initial question for the court on a motion for summary judgment with respect to a contract claim is 'whether the contract is unambiguous with respect to the question disputed by the parties.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465-68 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). Whether the contract is ambiguous is a question of law. *Int'l Multifoods*, 309 F.3d at 83; *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007); *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Ambiguity exists where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the

particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks omitted). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989), unless each is a "reasonable" interpretation, *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *see, e.g.*, *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) ("[N]o ambiguity exists where the alternative construction would be unreasonable."). Thus, a court should not find the contract ambiguous where the interpretation urged by one party would "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957).

Where the parties dispute the meaning of particular contract clauses, the task of the court "is to determine whether such clauses are ambiguous when read in the context of the entire agreement." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (internal quotation marks omitted). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008).

"As a general matter, the objective of contract interpretation is to give effect to the *expressed* intentions of the parties." *Hunt*, 889 F.2d at 1277 (emphasis added). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield*, 98 N.Y.2d at 569 (internal quotation marks omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms," *id.*, "without the aid of extrinsic evidence," *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks omitted). "Only when the language of the contract is ambiguous

may a court turn to extrinsic evidence of the contracting parties' intent." *Millgard Corp. v. E.E. Cruz/Nab/Fronier–Kemper*, No. 99 Civ. 2952, 2003 WL 22741664, at *2 (S.D.N.Y. Nov. 18, 2003) (quoting *Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990)).

A court should read an integrated contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases," *Bailey*, 8 N.Y.3d at 528, and "to safeguard against adopting an interpretation that would render any individual provision superfluous," *Int'l Multifoods*, 309 F.3d at 86 (internal quotation marks omitted). Further, the "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Bailey*, 8 N.Y.3d at 528 (internal quotation marks omitted).

## DISCUSSION

### I. CHI's First Claim for Breach of Contract

Count I of the Amended Complaint asserts a claim for breach of contract based on the Funds' early termination of the Exclusive Agency. CHI advances three theories of breach. First, CHI argues that the Funds lacked sufficient grounds to terminate the Exclusive Agency. Second, CHI argues that the Funds' notice of termination impermissibly failed to specify the date of termination. Third, CHI argues that the Funds failed to provide the requisite prior notice. Both parties have moved for summary judgment as to Count I. For the following reasons, the Court grants the Funds motion and denies CHI's motion as to this count.

#### A. *Adequacy of Grounds for Termination*

Even when drawing all reasonable factual inferences against the Funds, the record establishes that the Funds had adequate grounds to terminate the Exclusive Agency. Paragraph 10 of the 2006 Agreement permits the Funds to terminate the Exclusive Agency if there is a "repeated and marked deterioration" in CHI's level of service, "including untimely reporting or

8

recurring errors, which are the fault of CHI [and excluding] single-instance service errors, . . . which are not the fault of CHI." (2006 Agreement, *supra*, ¶ 10.) CHI asks the Court to construe the phrase "repeated and marked deterioration" to require proof that CHI's post-contract service was worse than its pre-contract service. (*See* Mem. Law Opp. Defs.' Mot. Summ. J. Supp Pl.'s Cross-Mot. Summ. J. at 10-12, ECF No. 59 [hereinafter Pl.'s Opp. Br.].) The Funds respond by arguing that the clause permits termination in the event of "recurring errors, which are the fault of CHI," even without proof that the level of service is demonstrably worse than before the 2006 Agreement was executed. (*See* Defs.' Opening Br., *supra*, at 11-14.)

Courts interpreting contract language have noted that the word "including" is definitional, *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 467 n.8 (1969), and is "designed to broaden the concept being defined," *Doniger v. Rye Psychiatric Hosp. Ctr.*, 505 N.Y.S.2d 920, 923 (App. Div. 1986). Here, the word "including" demonstrates the parties' intention to define "repeated and marked deterioration" to include, *inter alia*, "recurring errors" on the part of CHI. Accordingly, the Funds had grounds to terminate the Exclusive Agency if "recurring errors" occurred that were CHI's fault.[4] Because CHI's construction would require there to be a "deterioration" *in addition to* "recurring errors," CHI's construction would ignore the definitional function of the word "including" and render the phrase "including . . . recurring errors" superfluous. CHI's construction is therefore unreasonable. The Court will not "impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself," *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999), by requiring the Funds to

---

[4] CHI's principal objection to this construction is that it fails to give effect to the word "deterioration." (*See* Pl.'s Opp. Br., *supra*, at 12-14.) This objection is untenable, however, because the "including" clause *defines* "repeated and marked deterioration."

9

undertake a comparison of the level of service before and after the 2006 Agreement in addition to showing "recurring errors, which are the fault of CHI."

CHI attempts to invalidate this interpretation by offering evidence that CHI's president, Mr. Wesolowski, intended to exclude "'recurring errors . . .' by themselves" from the grounds for termination, explaining, "[T]hat would have gutted the exclusivity provision since . . . these types of errors are inherent in the industry." (Wesolowski Decl. ¶ 28.) This argument falls flat. First, Mr. Wesolowski's purported intention to exclude "recurring errors" is squarely at odds with the language of the contract, which expressly includes "recurring errors" as a ground for termination. Had the parties truly intended to exclude "recurring errors," they would have expressly done so, just as they excluded "single-instance service errors . . . which are not the fault of CHI" from the grounds for termination. The Court will give effect to only the "expressed" intention of the parties, *Hunt*, 889 F.2d at 1277, not an unwritten intention inconsistent with the contractual language. Furthermore, CHI's argument relies on extrinsic evidence, which is not admissible here because the language is unambiguous. *Millgard*, 2003 WL 22741664, at *2.

By reference to additional extrinsic evidence, CHI offers an alternative construction of the termination clause whereby only "significant" or "major" issues would justify termination. This interpretation is unreasonable, however, because neither "significant," nor "major," nor any adjective of similar import modifies the phrase "recurring errors" (*see* 2006 Agreement, *supra*, ¶ 10), and CHI does not specify any other basis within the four corners of the contract to read the termination clause as limited to only "significant" or "major" issues.[5] Therefore, this

---

[5] The phrase "repeated and marked deterioration" is of no help to CHI because, as explained above, that phrase is defined to include "recurring errors."

interpretation cannot give rise to an ambiguity, and the Court may not consider extrinsic evidence. *Readco*, 81 F.3d at 299. Nor may the Court read this limitation into the contract.

The adjective that does appear in the operative clause is "recurring." Recurring generally means "occurring or appearing again." *Recurring*, DICTIONARY.COM UNABRIDGED, http://dictionary.reference.com/browse/recurring (last visited Dec. 2, 2014). The word can carry an implied frequency, periodicity, or multiplicity, the degree of which can vary based on the parties' intent. *E.g.*, *Recurring*, OED ONLINE, http://www.oed.com/view/Entry/160098 ("That occurs again or is repeated, esp. *frequently, regularly, or periodically*." (emphasis added)) (last visited Dec. 2, 2014); *Recur*, OXFORD DICTIONARIES, http://www.oxforddictionaries.com/us/definition/american_english/recur ("Occur again, *periodically, or repeatedly*." (emphasis added)) (last visited Dec. 2, 2014); *Recur*, MERRIAM-WEBSTER.COM, http://www.m-w.com/dictionary/recur ("occur *time after time*." (emphasis added)) (last visited Dec. 2, 2014). But the volume of errors indisputably attributable to CHI in this case is so high,[6] *see supra* pp. 3-4, as to satisfy any frequency, periodicity, or multiplicity reasonably implied by the word "recurring."[7] No reasonable jury presented with these facts could find that the Funds had failed to show "recurring errors, which are the fault of CHI." Accordingly, no material issues of fact exist concerning whether the Funds had grounds to terminate the Exclusive Agency.

---

[6] It bears repeating that, consistent with its obligation to draw all reasonable factual inferences against the movant, the Court has reached this conclusion by ignoring those errors for which fault is reasonably disputed or the evidence fails to apportion fault. *See supra* note 3 and accompanying text.

[7] Moreover, there are additional, unrebutted facts that suggest that the volume of errors attributable to CHI met CHI's subjective understanding of the word "recurring." For example, CHI's president, who signed the 2006 Agreement on behalf of CHI and participated in the negotiation over the language of the termination clause (Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶¶ 28-37), agreed during his deposition that CHI's erroneous overbilling of donors "recur[red]." (*Id.* ¶ 70; Filburn Decl. Ex. 69 at 211:17-12:5, ECF No. 54-69.) Similarly, CHI's president and CHI's managing director further admitted that other types of billing errors attributable to CHI occurred "on more than one occasion." (Pl.'s Resp. Defs.' Rule 56.1 Stmt. ¶¶ 71, 80-81.)

B.     *Date of Termination*

The Funds were not required to specify the date of termination.  The 1996 Agreement and the 2006 Agreement each have their own termination clauses setting forth conditions for termination.  (*See* 1996 Agreement, *supra*, ¶ 11; 2006 Agreement, *supra*, ¶ 10.)  CHI argues that by terminating the Exclusive Agency, the Funds were required to comply with the 1996 Agreement's requirements.  (*See* Pl.'s Opp. Br., *supra*, at 17.)  But the unambiguous contract language contradicts CHI's construction.  The 1996 Agreement's termination clause is triggered by termination of the "Conditions and Procedures and all services" under the 1996 Agreement, and the 2006 Agreement's clause is triggered by termination of "the Exclusive Agency."  This is so even though the 2006 Agreement incorporates by reference the 1996 Agreement—the two clauses are triggered in different scenarios.  Thus, the 1996 Agreement's termination clause is *not* triggered by the termination of the Exclusive Agency.  CHI cannot end-run this issue by having Mr. Wesolowski testify that, despite the unambiguous contract language, "As for the method of termination, the terms of the 1996 Contract still applied."  (Wesolowski Decl. ¶ 29.) "If the contract language is unambiguous and conveys a definite meaning, its interpretation is a question of law for the court."  *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 288 (S.D.N.Y. 2014).

The Funds did not terminate the "Conditions and Procedures and all services" under the 1996 Agreement.  The Funds expressly terminated only the Exclusive Agency.  (*See* Wesolowski Decl. Ex. C, ECF No. 57-3 ("[T]he Fund is no longer required to honor the entire five and a half of [*sic*] years of exclusivity and will be terminating it early.").)  This act invoked the termination clause of the 2006 Agreement, not that of the 1996 Agreement.  The 2006 Agreement's termination clause does not require that the notice of termination specify the date of termination.  (*See* 2006 Agreement, *supra*, ¶ 10.)  As a result, there can be no breach.

C.   *Requisite Prior Notice*

The Funds also provided the requisite prior notice. The 2006 Agreement requires "prior written notice," and nothing more. (*See id.*) The Funds' 2006 Letter (i) was written, (ii) was sent prior to termination, and (iii) invoked the Funds' right of termination of the Exclusive Agency. (*See* Wesolowski Decl. Ex. D, ECF No. 57-4 ("If such errors continue in the future, the Funds reserves its right to consider ending the Exclusive Agency of our agreement with CHI.").) CHI provides no factual rebuttal, but instead argues that the 2006 Letter was insufficient.

First, CHI argues that too much time passed between the delivery of the 2006 Letter and the ensuing termination. (*See* Pl.'s Opp. Br., *supra*, at 18-19.) This argument is meritless. The contract imposes no such time limit, nor does it place an expiration on the effectiveness of any notice. The only temporal limitations are that notice be sent "prior" to termination and that a "repeated and marked deterioration in the level of service by CHI" occur after the notice, neither of which are in dispute. (2006 Agreement, *supra*, ¶ 10.) The parties could easily have inserted a time limit into the contract had that been their intent.

Second, CHI argues that when the Funds ultimately communicated their intention to terminate the Exclusive Agency—i.e., via the 2010 Letter—the Funds referenced errors from 2008 to 2010, and failed to reference the error described in the 2006 Letter. (*See* Pl.'s Opp. Br., *supra*, at 18-19.) But CHI never ties this argument to any contractual requirement. First, there is no express requirement that the ultimate notice of termination recite the errors listed in the "prior written notice." The 2010 Letter's failure to do so is irrelevant—the 2006 Letter still put CHI on notice that it was in danger of being terminated because of processing errors.[8]

---

[8] CHI's arguments are unclear and nonspecific, but CHI might be arguing that the 2006 Letter was deficient because it put CHI on notice of an error that was separate and distinct from the ultimate course of errors that led to CHI's termination. For this argument to be meritorious, the Court would need to construe the word "notice" to require that the writing recite the specific errors forming the basis for termination. However, such a construction would be

13

Finally, CHI argues that the 2006 Letter provided notice of errors "of a significant magnitude" only, but the Exclusive Agency was terminated for processing errors of lesser magnitude. (*See* Pl.'s Opp. Br., *supra*, at 18-19.)  This argument, too, is untenable.  The fact that the error recited in the 2006 Letter was of a "significant magnitude" is immaterial.  The 2006 Letter stated that the Funds "consider[ed] this error to be of the type referred to in Paragraph 10" of the 2006 Agreement.  It in no way prospectively limited the grounds for termination to errors of a significant magnitude, especially given that it invoked paragraph 10, which permits termination in the event of "recurring errors, which are the fault of CHI."  (2006 Agreement, *supra*, ¶ 10.)  CHI's argument finds no support in the facts or the contractual language.

CHI itself acknowledges that what was required was "a formal written notice that CHI was in danger of having the Exclusive Agency terminated."  (Pl.'s Opp. Br., *supra*, at 19.)  The 2006 Letter did so by stating, "If such errors continue in the future, the Funds reserves its right to consider ending the Exclusive Agency of our agreement with CHI."  (Wesolowski Decl. Ex. D.)  The error described in the 2006 Letter, whereby CHI double-billed more than 3,300 donors, was indisputably the type of error that, if it recurred, would justify termination.  Accordingly, the Court finds as a matter of law that the 2006 Letter constituted the requisite "prior written notice" under the 2006 Agreement.

\*          \*          \*

Even when drawing all factual inferences against the Funds, the record establishes that the Funds had adequate grounds for termination, were not required to specify the date of termination in writing, and provided the requisite prior notice.  Because none of CHI's theories

---

patently unreasonable because the 2006 Agreement requires that the "recurring errors" forming the basis for termination occur "*after* prior written notice."  (2006 Agreement, *supra*, ¶ 10 (emphasis added).)  The writing could not possibly have recited errors that had not yet happened.

14

for breach is tenable, the Court grants the Funds' motion for summary judgment as to Count I, and denies CHI's cross-motion as to Count I.

## II.  CHI's Second Claim for Breach of Contract

The Funds are further entitled to summary judgment on CHI's claim in Count II, which alleges that the Funds breached the 2006 Agreement by processing initial donations internally. Under well-established New York law, there is a clear distinction between a designation of an exclusive agent of a principal and a grant of an exclusive right to transact business on behalf of a principal. *See, e.g.*, *Slattery v. Cothran*, 206 N.Y.S. 576, 577 (App. Div. 1924) ("The general rule is that, where an exclusive right of sale is given a broker, the principal cannot make a sale himself without becoming liable for the commissions. But where the contract is merely to make the broker the sole agent, the principal may make a sale himself without the broker's aid" without incurring liability for the commission.); *Levy v. Isaacs*, 140 N.Y.S.2d 519, 519 (App. Div. 1955), *amended*, 143 N.Y.S.2d 642. A contract that merely establishes a third party as the exclusive agent of a principal does not preclude the principal from conducting business on its own. *See Carnes Commc'ns, Inc. v. Dello Russo*, 761 N.Y.S.2d 615, 616 (App. Div. 2003) (finding no breach of contract where defendant-principal placed advertisements on its own behalf despite agreement making plaintiff exclusive agent for placement of advertisements); *see also Joan Hansen & Co. v. Nygard Int'l*, 922 N.Y.S.2d 10, 11 (App. Div. 2011) ("The appointment of plaintiff as defendant's 'exclusive' licensing consultant did not, by itself, entitle plaintiff to commissions based on royalties from licens[es] produced by defendant."); *Salomon v. Angsten*, 797 N.Y.S.2d 14, 15 (App. Div. 2005) ("[T]he parties' letter agreement at most gave plaintiff an exclusive agency, not an exclusive right, to enter into design licensing agreements on defendants' behalf; therefore, defendants could enter into their own direct negotiations with prospective licensees.").

The law is clear and defeats CHI's claim. The 2006 Agreement granted CHI exclusive agency; therefore, the Funds were permitted to process donations internally. (2006 Agreement, *supra*, ¶ 9.)

CHI does not address New York law, but instead appeals vaguely to the "spirit of the agreement." (*See* Pl.'s Opp. Br., *supra*, at 22.) There is no legal basis to disregard unambiguous contractual language in favor of the "spirit of the agreement." *See Pensioenfonds Metaal En Techniek v. Strategic DSRG, LLC*, No. 09 Civ. 5644, 2012 WL 360549, at *8 (S.D.N.Y. Feb. 3, 2012) (rejecting arguments based on "the so-called 'spirit' of the agreement" where that spirit had "no basis in the actual *language* of the agreement"). Accordingly, as to Count II, the Court grants the Funds' motion for summary judgment and denies CHI's cross-motion.

## III. The Funds' Counterclaim

The Funds assert a counterclaim alleging that CHI's errors breached the 2006 Agreement, causing harm to the Funds. (*See* Am. Answer & Countercl. 7-13.) CHI's sole basis for moving on the Funds' counterclaim is that the alleged damages are speculative. (*See* Pl.'s Opp. Br., *supra*, at 22-23.) The Funds advance two damages theories.[9] First, the Funds claim that CHI's errors harmed the Funds' reputation. (*See* Am. Answer & Countercl. 13.) Second, the Funds claim that CHI's errors directly caused donors to cancel their ongoing recurring donations. (*See id.*)

As to the first damages theory, "New York law generally does not allow contract damages for injury to reputation." *Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc.*, No. 93 CIV. 0388 (MBM), 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995); *see also Smith v. Positive*

---

[9] A third theory—unnecessary expenditure of employee resources—was mentioned in the Funds' Counterclaim (*see* Am. Answer & Countercl. 13), but as the Funds offer no evidence in support of this theory, it appears to have been abandoned.

*Prods.*, 419 F. Supp. 2d 437, 453 (S.D.N.Y. 2005). It does so only in exceptional cases and when plaintiff proves "specific business opportunities lost as a result of its diminished reputation"; vague assertions will not suffice. *I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.*, 856 F. Supp. 168, 175 (S.D.N.Y. 1994); *Karestos v. Cheung*, 670 F. Supp. 111, 115 (S.D.N.Y. 1987). "Absent specific proof, damages for loss of reputation are too speculative to be recovered under contract law." *Saxton*, 1995 WL 679256, at *2. The Funds' counterclaim cannot rely on harm to reputation because the Funds have not presented evidence of any specific opportunities it lost because of the reputational harm. Their general assertion that they lost donations is insufficient.

Next, the Funds present insufficient evidence to support their second damages theory. The first piece of evidence is conclusory, unsubstantiated testimony by a Funds employee that processing errors "create[ ] a negative impression about [the Funds] that may mean that [donors] cancel their monthly giving." (Filburn Decl. Ex. 62 at 105:20-06:4, ECF No. 54-62.) "The non-moving party may not rely on conclusory allegations or unsubstantiated speculation" to survive a summary judgment motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The only other evidence submitted by the Funds is a September 11, 2007 email among Funds employees entitled "Documenting CHI Problems from September 2007," and explaining that after an "estimate[d] . . . 4k" donors' debit cards were erroneously double-authorized, "about 60" people called the Funds and "about 7 people quit while they were contacting us." (Filburn Decl. Ex. 58, ECF No. 54-58.) "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to survive a summary judgment motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. A lone, vague, self-serving

17

email containing a back-of-the-envelope calculation by a Funds employee that "about 7" donors out of thousands "quit" while calling about a transaction error does not provide a sufficient basis for a jury to reasonably conclude that donors canceled their recurring donations because of CHI's errors. As CHI rightly points out, the email does not recount the reasons given by the callers for canceling, if any.[10] The author of the email testified, for example, that the donors may have intended to cancel for other reasons and were simply reminded to do so by the processing issue. (*See* Filburn Decl. Ex. 62 at 106:5-18, ECF No. 54-62.) The evidence presented in support of this damages theory is wholly insufficient.

Because the Funds' damages theories are fatally flawed, the Court grants CHI's cross-motion for summary judgment as to the Funds' counterclaim.

## CONCLUSION

For the foregoing reasons, the Funds' motion for summary judgment is GRANTED in its entirety, and CHI's cross-motion for summary judgment is GRANTED in part and DENIED in part. The Court respectfully directs the Clerk (i) to enter judgment in favor of the Funds as to CHI's claims and in favor of CHI as to the Funds' counterclaim and (ii) to close this docket.

Dated:  December 12, 2014  
        White Plains, New York

SO ORDERED:

_____  
NELSON S. ROMÁN  
United States District Judge

---

[10] Even if the email had related the callers' stated reasons, that would be hearsay. "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (alteration in original). The email even as it stands presents potential hearsay problems; however, because CHI has not raised this issue, the Court will refrain from deciding it.